Filed 10/18/24  P. v. Singh CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>KAMALPREET SINGH,<br><br>       Defendant and Appellant. | A168215<br><br>(Alameda County Super. Ct. No. 20CR011941) |

Defendant Kamalpreet Singh appeals his conviction of second degree murder.  Singh asserts the police failed to provide an adequate *Miranda*[1] warning, the trial court abused its discretion in allowing a deputy to be posted in the courtroom during his testimony, and the trial court made various instructional errors.  He further contends the court violated his constitutional rights by imposing fines without first assessing his ability to pay.

We conclude the court failed to exercise its discretion in determining whether the deputy's presence was appropriate and erred by instructing the jury with CALCRIM No. 361.  Finding those errors harmless, and finding no other basis for reversal, we affirm the judgment.

_____

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

1

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

Singh was employed by Manjeet "Jay" Summan at Summan Trucking Company. Summan helped Singh purchase a green Cadillac Escalade sports utility vehicle (SUV). On both the day of the incident and the previous day, surveillance cameras recorded Singh at different convenience stores with the SUV.

In the early evening of April 8, 2020, Anthony Garza and his friends were in a shopping center parking lot, smoking marijuana in a friend's vehicle. Garza's vehicle was parked next to them. Singh's green Escalade SUV pulled in front of the friend's car and drove by slowly, during which the driver gestured and "mean-mugged" them. The SUV then "almost did a circle around us" before quickly leaving.

Approximately twenty minutes later, the SUV returned and parked adjacent to the passenger side of Garza's vehicle. Garza, who was sitting in his car at the time, exited his vehicle and walked around to the passenger side of his vehicle. A witness testified Garza was standing next to the passenger side door of his car and "there was a gap" between his car and the SUV; Garza "w[as]n't up against the Escalade." Just prior to the shooting "everything" "seemed normal." Garza was shot once in the chest, after which the SUV immediately drove away. This encounter only lasted approximately ten seconds.

Police responded to the shooting and found Garza bleeding but coherent. Garza was unarmed. When asked who shot him, Garza responded, "I don't know. Dude just pulled up on me." He identified the shooter's vehicle as a dark green Escalade. Garza subsequently died at the hospital.

2

Traffic cameras recorded the SUV traveling away from the shopping center immediately following the shooting. Approximately an hour and a half later, a traffic camera recorded the SUV driving in the immediate vicinity of Summan Trucking Company. Police subsequently recovered the SUV from Summan Trucking Company.

Approximately five months later, police arrested Singh in Denver, Colorado. During the subsequent police interview, Singh admitted he had shot Garza. He stated Summan had asked him to kill Garza because of a dispute between Summan and Garza, and he had agreed to do so because he needed money.

*Procedural Background*

The Alameda County District Attorney filed an information charging Singh with murder (Pen. Code,[2] § 187, subd. (a); count 1). The information further alleged personal and intentional discharge of a firearm (§§ 12022.7, subd. (a), 12022.53, subd. (d)) and infliction of great bodily injury (§ 12022.7).

During trial, the prosecution offered the police interview containing Singh's confession into evidence. Singh testified in his defense and denied shooting Garza. He asserted Garza and Summan had an ongoing disagreement, and Summan took his SUV. When he confronted Summan about using the SUV, Summan responded that he would take care of it, "And if you mention it to somebody, then worry about your family." Summan also told him to leave the area. Singh stated he lied to police during the interview because he was worried about his family.

The jury found defendant guilty of second degree murder. The trial court sentenced defendant to a prison term of 15 years to life for murder, and 25 years to life for the discharge of a firearm causing death.

---

[2] All further undesignated statutory references are to the Penal Code.

3

Singh raises four main arguments on appeal. First, he contends the police failed to provide a proper *Miranda* warning during his in-custody interview, and he did not waive any *Miranda* rights. Second, Singh contends the court abused its discretion by allowing the sheriff's department to position a uniformed deputy between himself and the jury during his testimony. Third, Singh asserts he was denied a fair trial because the court instructed the jury with CALCRIM No. 361 without any support for the instruction. Fourth, Singh argues the court erred in refusing to instruct the jury with CALCRIM No. 571. Singh also contends these multiple errors cumulatively deprived him of a fair trial. Finally, Singh challenges the imposition of certain fees without a showing of ability to pay. We address each argument in turn.

## I. In-Custody Police Interview

Singh contends his *Miranda* waiver was invalid and his statement was involuntary because the police advised him of the *Miranda* warnings in English and the entire interview was conducted in English. Singh asserts the evidence does not support a finding that he sufficiently understood English to knowingly waive his constitutional rights.

### A. Relevant Law

" '*Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right

4

being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " (*People v. Combs* (2004) 34 Cal.4th 821, 845.)

"[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases.  A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision.  [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied.  [Citations.]  A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. [Citations.]  In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning." (*People v. Cruz* (2008) 44 Cal.4th 636, 667–668.)

In assessing the totality of the circumstances to determine if the defendant gave a valid *Miranda* waiver, and whether his statement was voluntary for due process purposes, the court considers the "background, experience, and conduct of the accused" (*People v. Davis* (2009) 46 Cal.4th 539, 586), including the defendant's language abilities.  (*United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 751, disapproved on other grounds in *United States v. Dozier* (9th Cir. 1988) 844 F.2d 701, 706.)

A defendant's language abilities may impair his ability to give a knowing and intelligent waiver and render his statement involuntary.  (See, e.g., *United States v. Heredia-Fernandez* (9th Cir. 1985) 756 F.2d 1412, 1415–

1416.)  "Language is not a stumbling block when the suspect is advised of his rights also in a language that he ostensibly understands.  [Citation.]  It becomes a more difficult problem when the *Miranda* rights are given in English only.  In these instances, the courts consider what effort the officer made to communicate, whether the defendant responded that he understood his rights or ever indicated that he did not understand them, and what the defendant displayed in English language skills."  (*United States v. Castorena-Jaime* (D. Kan. 2000) 117 F.Supp.2d 1161, 1171.)

Even where a defendant has limited skills in English, however, he may knowingly, intelligently, and voluntarily waive his *Miranda* rights, provided the totality of the circumstances indicates he understood those rights when he waived them.  (See *People v. Salcido* (2008) 44 Cal.4th 93, 127–128; *United States v. Amano* (9th Cir. 2000) 229 F.3d 801, 804–805.)

The prosecution must establish "the voluntariness of defendant's waiver and confession . . . by a preponderance of the evidence."  (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)  On appeal, we conduct an independent review of the trial court's legal determinations.  (*People v. Williams* (2010) 49 Cal.4th 405, 425.)  When an interview is tape-recorded, the facts surrounding an admission or confession are undisputed, making the issue subject to our independent review.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176–1177.)

## B.  Relevant Background

Singh initially sought to suppress evidence of the police interview and, when that motion was rejected, moved to dismiss the information on the basis that the magistrate judge erroneously denied his motion to suppress. Singh alleged the police failed to provide an adequate and meaningful advisement of his right to counsel during the interrogation, and he was subjected to psychological interrogation techniques.  During argument, Singh

6

also noted the police never offered him an interpreter or sought to determine "whether [Singh] understood exactly what was going on."

Following argument by counsel, the trial court rejected the motion to dismiss. As relevant to this appeal, the court noted Singh "did not have any questions about his rights, he never asked for an attorney at any time and never asked that any questioning should cease. And the answers seemed to be responsive to the questions, and if I can describe it, it seemed conversational."

Singh subsequently filed a motion in limine to suppress his statement to the police. In response, the court conducted a hearing pursuant to Evidence Code section 402 to address the admissibility of Singh's statements to police. Detective Brent Butcher was the sole witness; Singh did not testify. The recording of the police interview was submitted to the court for its review.

Detective Butcher testified that he advised Singh of his *Miranda* rights from memory. After reciting the rights, Detective Butcher asked Singh if he understood his rights. Singh responded in English, "Yeah." Detective Butcher testified that it appeared to him that Singh understood his rights. Detective Butcher acknowledged that he was aware English was not Singh's first language and "potentially [Singh] did not speak English very well." Accordingly, Detective Butcher stated he had an interpreter option available. However, Detective Butcher did not utilize the interpreter because he "did not feel we needed to"; he felt Singh understood his questions, answered them directly, and he understood Singh's answers. Detective Butcher noted Singh did not request an interpreter, and Singh did not invoke his right to remain silent.

7

The transcript of the interview also indicates that Singh and the detectives were able to communicate. With few exceptions, Singh never indicated during the interview that he did not understand any of the questions asked by the detectives or was confused by any terminology used by the detectives. Rather, the only discussion about comprehension was when Singh asked the detectives if they "understand my English," to which they responded affirmatively. And any temporary confusion between Singh and the police—such as mistaking "temple" for "Tampa," a mistake that could have also been made by a native English speaker—was quickly clarified.

The court concluded Singh's statements to the police were admissible. On the issue of a translator, the court found the interview to be "a free-flowing, back-and-forth exchange between the detectives and [Singh]. The vast majority of clarifications that came about in terms of questioning largely had to do with people involved, the events that were involved, the chain of events as they were set forth, questions about days and questions about times and questions about location. . . . [¶] I will concede there was a word here or there that [Singh] appeared to struggle with, but eventually either found the word, or . . . the detectives were able to quickly discern what it was he was trying to say . . . . But, again, it appeared to this Court that although [Singh's] first language might not be English, he certainly appeared to be fully conversant in the English language from the beginning of the interview to the end."

## C. Analysis

Having reviewed the entire audio-recording of the detectives' interview of Singh, we find that Singh's *Miranda* waiver was knowing and intelligent, and his statements were not involuntary or obtained in violation of due process. When Detective Butcher advised Singh of the entirety of the

8

*Miranda* warnings in English, and asked if he understood, Singh responded affirmatively and in English.

Singh then proceeded to converse with the detectives—exclusively in English—throughout the entire interview. The record indicates Singh understood and appropriately responded to questions, giving information about his background (e.g., whether he had been previously arrested, his name and date of birth, his current and past residences) and his employment with Summan. When Singh was asked to explain inconsistencies in his initial story, such as how his SUV was involved in the shooting if Singh was not driving it, Singh responded, "my boss he could drive." In responding rationally and appropriately to the questions, Singh showed he had a sufficient understanding of English.

During the interview, Singh used more complex English words, such as referencing the SUV's "grille" and using the term "murder" before the phrase was mentioned by the police Singh also demonstrated a substantial understanding of English by attempting to bargain with them before providing a confession: "so I need a guarantee who gonna save my parents in India" before giving his confession. He then explained—in English—the political situation impacting his parents, noting his parents' situation "is very bad there" because he "supported Kazakhstan" and asked if the detectives knew Kazakhstan. Singh explained, because of his support of Kazakhstan, his "dad had a[n] accident" and "so we need the money for house [sic]." He explained his sister was "settle[d] in Canada" and "good," but caring for his parents was his responsibility as "the boy." Singh then proceeded to give a detailed summary of events, stating that his boss offered to pay him to kill Garza because Summan had "some issue with him." Singh explained he "needed money" and Summan "pressured" him and gave him a gun. Singh

also explained how Summan ultimately never paid him, complaining "Look I did this bullshit and he not give me more money."

The record reflects that Singh was comfortable asking questions of the detectives when he felt it was needed. But Singh never stated he did not understand any questions or otherwise struggled to comprehend English during the interview. Nor do his responses to the questions indicate any meaningful inability to comprehend English. To the extent some of Singh's responses may have been disjointed or nonlinear, nothing in the record suggests those responses were based on a misunderstanding of English. Rather, our task is to view any such rambling responses in the context of the entire interview. And viewed in such context, Singh's responses demonstrate a solid understanding of English.

Accordingly, based on the totality of the circumstances, we conclude Singh was adequately informed of his *Miranda* rights, and he had the capacity to—and did—knowingly and intelligently provide an implied waiver of those rights. (See *United States v. Rodriguez-Preciado* (9th Cir. 2005) 399 F.3d 1118, 1127–1128 ["The district court's finding that Rodriguez–Preciado's alleged difficulty with English did not prevent him from knowingly and intelligently waiving his *Miranda* rights was not clearly erroneous. . . . Rodriguez–Preciado 'indicated that he understood his rights after they were explained to him,' [citation], and the district court found that, except for some confusion regarding the word 'methamphetamine,' there was 'no indication by any of the officers that Mr. Rodriguez had difficulty understanding English nor that the officers had trouble understanding his English.' "].) The trial court did not err in finding the interview admissible.[3]

---

[3] Because we find no error in admitting the statements, we need not address Singh's arguments regarding prejudice.

## II.  Placement of Deputy in Courtroom

Singh next contends the trial court abused its discretion by permitting a sheriff's deputy to sit between him and the jury midway through his testimony.  He asserts the presence of a uniformed deputy was prejudicial and deprived him of a fair trial because it suggested there had been a determination that he posed a danger.

### A.  Relevant Background

The record does not directly reflect when the sheriff's deputy entered the courtroom and where he or she sat.  Accordingly, we consider the facts as set forth in the parties' subsequent arguments to the trial court as discussed below.

After the court adjourned for the day, the court allowed defense counsel to "lodge an objection to the procedure employed as it relates to having a sheriff's deputy in – well, with your client while he's testifying."  Defense counsel then set forth the following objection: "I would lodge an objection to having the deputy sit, I would say relatively close to my client, specifically next to the jurors.  [¶]  I think it displays an implication of dishonesty, dangerousness, and a sense of guilt towards Mr. Singh as he testifies.  [¶]  I do not believe he's got a history at all whatsoever of any violent outbursts or disrespect to this Court.·I think he's been pretty obedient and respectful throughout this process.·So I would object, or I just want to lodge an objection to having the deputy sitting next to my client in the presence of the jury under U.S. Constitution due process."

The court then responded: "I would concur with your observations that Mr. Singh has been more than compliant with any and all court orders.·He hasn't been disruptive at all, not even close.  [¶]  However, that's not the standard by which the Sheriff's Department determines how it handles

11

custodial defendants, especially when they opt to testify.  [¶]  I think it's important to note that it's essentially standard operating procedure to have a deputy somewhere near an in-custody defendant while they testify.  [¶]  I think it's also important to note that each of the deputies has sat some distance away, in stark contrast to . . . when on many occasions they sit right in the witness box with them. · That's certainly not the case here. · I don't know if after a while if you notice the deputies were there. · Again, that's their call. · It's their purview. · It's not a court call and it's not something I'm inclined to disrupt."  The court further noted it would give a jury instruction about a defendant testifying while in custody, which it thought would "address[ ] any and all issues that the defense might be concerned about."

## B.  Analysis

"Decisions to employ security measures in the courtroom are reviewed on appeal for abuse of discretion."  (*People v. Hernandez* (2011) 51 Cal.4th 733, 741 (*Hernandez*).)  The propriety of stationing a deputy near a defendant during his or her testimony was addressed by the California Supreme Court in two decisions, *People v. Stevens* (2009) 47 Cal.4th 625 (*Stevens*) and *Hernandez*, *supra*, 51 Cal.4th 733.  In *Stevens*, the California Supreme Court held that the presence of a deputy—provided he or she "maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony"—is not inherently prejudicial.  (*Stevens, supra,* 47 Cal.4th at pp. 639, 644.)  However, the court noted "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy."  (*Id*. at p. 644.)  The court further explained "[t]he trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record

12

why the need for this security measure outweighs potential prejudice to the testifying defendant." (*Id.* at p. 642.)

In *Hernandez*, the trial court did not follow the procedure set forth in *Stevens*, i.e., "the trial court's decision to station a deputy at the witness stand during defendant's testimony was not based on a thoughtful, case-specific consideration of the need for heightened security, or of the potential prejudice that might result." Rather, "[t]he court asserted that it had seen a deputy at the witness stand 'in every trial I've ever done . . . because of security' " and "refused to make an individualized finding that defendant's behavior warranted this heightened security measure. . . . These remarks reveal that the court was following a general policy of stationing a courtroom officer at the witness stand during any criminal defendant's testimony, regardless of specific facts about the defendant or the nature of the alleged crime." (*Hernandez*, *supra*, 51 Cal.4th at p. 743.) The court explained that while stationing a deputy near a defendant during his or her testimony "is not inherently prejudicial," the trial court's failure to exercise its own discretion apart from deferring to generic policy constituted an abuse of discretion. (*Id.* at pp. 742, 744.)

The California Supreme Court further concluded, however, that the error was harmless. (*Hernandez*, *supra*, 51 Cal.4th at p. 746.) It explained "nothing in the record suggests that this deputy's demeanor was anything other than respectful," "the jury had little indication that defendant was in protective custody," and "the evidence presented at trial strongly supports the jury's verdict." (*Id.* at pp. 746–747.)

Here, the trial court—as in *Hernandez*—did not exercise its own discretion and instead referenced the Sheriff's Department's "standard operating procedure to have a deputy somewhere near an in-custody

13

defendant while they testify" and stated the placement of a deputy is "their purview" and "not a court call." In so holding, the trial court misunderstood its role and failed to properly exercise its discretion.

However, we find such error harmless. (See *Hernandez, supra*, 51 Cal.4th at pp. 744–745 [harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) applies].)

First, as noted in the record, the deputy was not seated adjacent to Singh or the witness box but rather next to the jury. As described by the trial court, the deputy sat "sat some distance away" and was sufficiently unobtrusive that the court thought people could forget he or she was present. The location of the deputy thus does not raise the same concerns as when he or she is, for example, directly adjacent to the defendant.

Second, defense counsel expressly declined the court's offer to instruct the jury with CALCRIM No. 337 (witness in custody) because "all it does it draw attention to something that I haven't mentioned." Instead, the court simply instructed the jury "You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice that you might have."

Third, the record indicates the deputy entered at some point during Singh's testimony. Since the deputy was not present for the entirety of Singh's testimony, a jury would not necessarily have assumed the deputy's presence was related to Singh's testimony rather than for some other reason, for example the deputy's standard job duties in the courtroom.

Fourth and finally, Singh has not demonstrated that the presence of the deputy affected the outcome. The record contained a compelling confession given by Singh to the police, identification of his SUV as involved in the shooting, and surveillance video of Singh driving the SUV on the day of the shooting. (See *People v. Winbush* (2017) 2 Cal.5th 402, 461 ["[T]he

14

evidence against defendant was strong, much of it coming from his own detailed statements to the police . . . . Given the compelling evidence of guilt, it is not reasonably probable defendant would have obtained a more favorable result absent the error."].)

Accordingly, Singh has not demonstrated that it was reasonably probable he would have received a more favorable result in the absence of the error.

## III.  CALCRIM No. 361

Singh contends the court erred in instructing the jury with CALCRIM No. 361, which addresses a defendant's failure to explain or deny evidence. He asserts he did not fail to explain or deny his incriminating statements to police but rather contradicted those statements, which is not a valid basis for the instruction.  The Attorney General agrees the court erred in giving the instruction, but asserts the error was harmless.

We agree the court erred by instructing the jury with CALCRIM No. 361.  To determine whether a CALCRIM No. 361 instruction was improper, we " 'ascertain if [the] defendant . . . failed to explain or deny any fact or evidence that was within the scope of relevant cross-examination' and was 'within [the defendant's] knowledge which he did not explain or deny.' " (*People v. Grandberry* (2019) 35 Cal.App.5th 599, 606; see *People v. Cortez* (2016) 63 Cal.4th 101, 117 (*Cortez*) [instruction "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge"].)  Testimony from the defendant that is merely vague, improbable, or unbelievable is not enough to support giving the instruction.  (*Cortez*, at p. 117.)

15

Here, Singh testified he hung out alone at a park on the day of the shooting, explained he lied about being the shooter in the police interview because he was worried Summan would harm his family in India, and categorically denied any involvement in the shooting. Accordingly, the court lacked a valid basis to give the instruction.

However, we agree with the Attorney General that the error was harmless. To obtain a reversal, Singh must show a reasonable probability that he would have obtained a more favorable result at trial if the instruction had not been given. (See *Watson, supra*, 46 Cal.2d at p. 836; *People v. Saddler* (1979) 24 Cal.3d 671, 683–684 (*Saddler*) [assessing the harmlessness of an instruction under CALJIC 2.62, the precursor to CALCRIM No. 361].) He failed to do so.

CALCRIM No. 361 is a conditional instruction, leaving it to the jury to determine, based on the jury's view of the evidence, whether the instruction applies. In particular, the instruction informed the jury that *if* Singh failed to explain or deny evidence against him, and *if* he could reasonably be expected to have done so based on what he knew, then the jury could—but need not—consider his failure to explain or deny such evidence in evaluating its weight. In addition, the trial court instructed the jury, pursuant to CALCRIM No. 200, that "[s]ome of these instructions may not apply, depending on your findings about the facts of the case," the jury should "not assume just because [the court gave] a particular instruction that [the court was] suggesting anything about the facts," and after deciding the facts the jury was to "follow the instructions that do apply to the facts as you find them." We presume the jury followed CALCRIM No. 200. (*People v. Cain* (1995) 10 Cal.4th 1, 34.) Thus, if CALCRIM No. 361 was given erroneously because Singh had not failed to deny or explain adverse evidence within his

16

knowledge, the jury would have disregarded the instruction; any error in giving it was therefore harmless. (*Saddler*, *supra*, 24 Cal.3d at p. 684; *People v. Vega* (2015) 236 Cal.App.4th 484, 503 (*Vega*) [CALCRIM No. 200 mitigated any prejudice from giving CALCRIM No. 361].)

And if the jury did find that CALCRIM No. 361 applied, the instruction makes clear that Singh's failure to explain or deny evidence "is not enough by itself to prove guilt" and that the prosecution "must still prove the defendant guilty beyond a reasonable doubt." Rather than requiring the jury to draw an adverse inference, the instruction allows the jury to "decide the meaning and importance" of any failure to explain or deny. (*People v. Ballard* (1991) 1 Cal.App.4th 752, 756–757; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472; *Vega, supra*, 236 Cal.App.4th at pp. 502–503.)

Finally, substantial evidence supported the jury verdict, regardless of the CALCRIM No. 361 instruction. As previously discussed, the evidence was undisputed that Singh's vehicle—a green Cadillac Escalade SUV—was involved in the shooting. Surveillance cameras captured Singh driving the vehicle in the early morning hours of the day of the shooting as well as the previous day. And Singh accurately described Garza's movements and the vehicle's movements on the day of the shooting during the police interview. Finally, a witness identified Singh as the possible driver of the Escalade, stating she was "pretty sure that that's who I seen driving the green Escalade," although she was not entirely certain. These facts, combined with Singh's confession during the police interview, amply support the jury verdict.

Singh asserts the jury's requests for readback of his testimony and the police interview demonstrate that mens rea was a significant issue for jury deliberations, the jury's assessment of his credibility was critical, and the

17

instruction invited the jury to speculate as to what he failed to explain. He thus argues the error was not harmless. But, as explained above, CALCRIM No. 200 alerted jurors to the fact that some instructions may not apply; at most, they would have assessed whether CALCRIM No. 361 was relevant. And even if they erroneously found it applicable, CALCRIM No. 361 does not instruct the jury to draw a negative inference based on a defendant's failure to explain or deny evidence. Rather, CALCRIM No. 361 simply advises the jury that they may consider a defendant's failure to explain or deny the prosecution evidence and give it such weight as the jury deems appropriate.

Based on the instructions as a whole and substantial evidence of guilt, we conclude instructing the jury with CALCRIM No. 361 did not constitute prejudicial error.

## IV. CALCRIM No. 571

Singh next asserts the trial court erred by refusing to give CALCRIM No. 571 (imperfect self-defense). "Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder. [Citation.] [¶] A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.] [¶] We review de novo a trial court's decision not to give an imperfect self-defense instruction.' " (*People v. Simon* (2016) 1 Cal.5th 98, 132–133 (*Simon*).)

18

## A. Relevant Background

Defense counsel requested the court instruct the jury with CALCRIM No. 571. Counsel argued "if the jury believes my client, in his interview with police, there was mention of him observing potentially Mr. Garza reach for a gun; there was some sense of fear. And I would say some talk about potential argument or discussion of mean-mugging that was going on between them. . . . That's the factual basis for that request." "Out of an abundance of caution," the prosecution did not object to the instruction.

The court declined to give the instruction, explaining "the doctrine of imperfect self-defense is narrow," and "[s]uch instruction is not required unless there is substantial evidence to support the defense." The court further noted Singh, in his police statement, "admits to being the shooter and briefly touches upon the fact, oh, I was scared. And then comes to court and testifies, no, that was all baloney. It wasn't even me. So I keep going back to that. . . . [¶] . . . [And] if you believe his statement that he was, in fact, the shooter, he drives into the Lucky's lot, rolls around, comes upon Mr. Garza. . . . He then leaves, . . . he had ample time to return to his home, grab the firearm that he was pictured with, come back, drive immediately to where Mr. Garza is and, in a matter of seconds, bang, bang, bang, out he goes. [¶] So, again, I don't see how any of that presents substantial evidence that there's self-defense of any kind."

## B. Analysis

Singh's argument that he was entitled to a CALCRIM No. 571 instruction fails for two reasons. First, "[a]n instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death." (*Simon*, *supra*, 1 Cal.5th at p. 132.) To qualify as an imminent danger, " '[t]he peril

19

must appear to the defendant as immediate and present and not prospective or even in the near future.  An imminent peril is one that, from appearances, must be instantly dealt with.' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, italics omitted.)  " 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.' " (*Ibid.*)

Singh argues there was a factual basis for the instruction because he stated in his police interview that Garza "come to me."  He further stated he "think [Garza] has a gun" and "trying to kill me," so he was scared and "before he shoot me, I shoot him."  However, Singh also stated he had already decided to kill Garza after first seeing him in the parking lot because he "pray to God" and decided Garza "is not a very good guy."  After returning to the parking lot, Singh stated he "promised to God" that if Garza approached him, he would shoot Garza, but if Garza did not approach him then he would not shoot Garza.  Neither of these statement suggest the shooting was the result of an imminent fear of great bodily injury or death.

In total, Singh's statements do not constitute substantial evidence from which a jury could conclude Singh acted in imperfect self-defense; i.e., that Singh actually believed he was in imminent danger of great bodily injury or death.  At most, they reflect a fear of harm at some point in the near future. Singh did not state he saw Garza holding a gun or making any motions that he believed were reaching for a gun.  Nor did Singh state that Garza made any comments or gestures threatening to harm Singh.  Rather, Singh provided generic statements that he believed Garza had a gun and wanted to kill him.  But these statements do not indicate that Singh believed Garza was in the act of attempting to do so when Singh shot him.  To the contrary, Singh stated he had decided to shoot Garza if Garza approached his vehicle.

20

Accordingly, the evidence does not reflect a genuine belief by Singh that he was in imminent danger of great bodily injury or death.

Singh's argument that he was entitled to a CALCRIM No. 571 instruction also fails because imperfect self-defense may not be invoked "by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Here, despite allegedly being told that Garza had a gun and wanted to kill him, Singh sought him out and, upon locating him, "mean mugged" at Garza and his friends. He then left, went to his house to get his gun, and returned to the parking lot where he saw Garza. He proceeded to park directly next to Garza. And when Garza—unarmed—approached his vehicle, Singh did not attempt to leave but immediately shot Garza. At every stage of the interactions between Singh and Garza, Singh was the initiator. He cannot do so, and then attempt to argue self-defense. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649 [testimony and evidence indicated "Beck and Cruz executed a surprise attack on the victims and brutally murdered them, and thus . . . provides no substantial basis for an instruction on imperfect self-defense."].)

Accordingly, the trial court properly declined to instruct the jury with CALCRIM No. 571.

## V. Cumulative Error

" 'Under the cumulative error doctrine, the reviewing court must "review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to [the] defendant in their absence." [Citation.] When the cumulative effect

of errors deprives the defendant of a fair trial and due process, reversal is required.' " (*People v. Doane* (2021) 66 Cal.App.5th 965, 984.)

Here, two errors occurred: instructing the jury with CALCRIM No. 361 and the court's failure to exercise its discretion in assessing whether a deputy was required to be posted by the jury during Singh's testimony. The question thus is whether it is reasonably probable that, absent the errors, at least one juror would have voted to acquit Singh of murder. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520–521 [hung jury more favorable result than guilty verdict under *Watson*].) We conclude the answer is no. As discussed above, substantial evidence supported Singh's murder conviction. The evidence reflects the jury carefully considered his police interview and testimony. They requested transcripts of both be provided during deliberations and found themselves "stuck on 1st or 2nd degree murder," before ultimately convicting Singh of second degree murder. The jury's detailed evaluation of the evidence indicates they did not assume guilt based on these errors. Nor does any evidence suggest the errors negatively impacted the jury's deliberations. Based on the entire record, we conclude beyond a reasonable doubt the two errors did not contribute to the guilty verdict.

## VI. *Dueñas*[4] Claim

During sentencing, the trial court imposed in relevant part a court security fee of $40 under section 1465.8, subdivision (a) and a criminal conviction assessment of $30 under Government Code section 70373. Singh objected, arguing he had "no economic ability to pay any of those fines" and requested the court not impose such fines. The court noted that due to the length of Singh's incarceration, "there may be an ability to pay that over

---

[4] *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

time." On appeal, Singh relies on *Dueñas*, *supra*, 30 Cal.App.5th 1157 to argue the imposition of fees and court assessments without a prior determination that he has the ability to pay violates his right to due process and the prohibitions against excessive fines.

In *Dueñas*, the defendant was a chronically-ill, unemployed unhoused woman with cerebral palsy and a limited education who supported her two children through public aid. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.) She had lost her driver's license because of her inability to pay her juvenile citations and then had acquired three misdemeanor convictions for driving without a license because the accumulating fines and fees prevented her from clearing the citations and recovering her license. (*Id*. at p. 1161.) She thus experienced a series of "cascading consequences" because of "a series of criminal proceedings driven by, and contributing to, [her] poverty," and she had already been ordered to pay the charges by the end of her probation period. (*Id*. at pp. 1160, 1163–1164.) The Court of Appeal reversed the challenged assessments, holding "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair [and] imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process . . . ." (*Dueñas*, at p. 1168.) It ordered the trial court to stay the restitution fine "unless and until the People prove that [the defendant] has the present ability to pay it." (*Id*. at pp. 1172–1173.)

Here, Singh has not suffered a series of "cascading consequences" because of a "series of criminal proceedings" which have resulted in his inability to pay a $40 fine and $30 assessment. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056 ["unique concerns addressed in *Dueñas*" were

23

"lacking;" "Nothing establishes or even reasonably suggests that appellants face ongoing unintended punitive consequences."].) Furthermore, Singh has been sentenced to a lengthy prison term. While at the time of sentencing he may have had an inability to pay, nothing in the record indicates he will be ineligible for or unable to perform prison work assignments. One can therefore reasonably infer that an amount sufficient to cover the $70 in fines will be deducted from his prison wages over the course of his incarceration. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [court "can infer defendant . . . has the ability to pay the fines and fees imposed upon him from probable future wages, including prison wages"]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [any *Dueñas* error was harmless given long prison term and no evidence of inability to work].)[5]

## DISPOSITION

The judgment is affirmed.

---

[5] We therefore need not, and do not, weigh in on the correctness of *Dueñas*'s reasoning, an issue on which the Supreme Court has granted review. (*People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

_____
PETROU, J.

WE CONCUR:


_____
TUCHER, P. J.


_____
RODRÍGUEZ, J.


*People v. Singh*/A168215